**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

BRANELDA SUE HAALAND,
Individually and as Personal Representative
of the Estate of Billie Jo Hall, deceased,
RICHARD HALL, and RICHARD WAYNE HALL,

      Plaintiffs,

v.                                 CIV 16-1199 KBM/GJF

PRESBYTERIAN HEALTH PLAN, INC.,
a New Mexico corporation, and
PRESBYTERIAN HEALTHCARE SERVICES,
a New Mexico corporation, and
GREGG VALENZUELA,

      Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

THIS MATTER comes before the Court on Defendant Presbyterian Health Plan, Inc.'s ("PHP's") Motion for Summary Judgment on Federal Defenses (*Doc. 40*), filed September 18, 2017. Pursuant to 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73(b), the parties have consented to me serving as the presiding judge and entering final judgment. *See Docs. 4-5, 7, 9.* Having considered the record, submissions of counsel, and the relevant law, the Court finds that the motion is well-taken and will be granted.

**I.   INTRODUCTION**

Plaintiffs initiated this action in state district court on July 15, 2016. *See Doc. 1.* They alleged that their decedent, Billie Joe Hall ("Ms. Hall"), "died from a wrongful and tortious denial of a liver transplant evaluation," for which the "Estate seeks damages for her wrongful death." *Doc. 37* at ¶ 7. PHP removed the action to this Court under the

Federal Officer Removal Statute, 28 U.S.C. § 1442(a)(1), and Plaintiffs responded with a motion to remand. *Doc. 17*. At an April 4, 2017 hearing on the Motion to Remand, Plaintiffs conceded that for three of their causes of action – those asserted under the Insurance Practices Act, NMSA § 59-A-16-20, the Unfair Trade Practices Act, NMSA § 57-12-2, and § 13.10.13.8 of the New Mexico Administrative Code – the Medicare Act's directives and extensive regulation supported removal under Section 1442(a)(1). *Doc. 23*. Based upon this concession, the Court denied Plaintiff's Motion to Remand. *Doc. 24*.

Thereafter, Plaintiffs filed their Third Amended Complaint, omitting those claims for which they had conceded preemption. *See Doc. 37*. In the now-operative complaint, Plaintiffs assert two claims against PHP under New Mexico's Wrongful Death Act. In Count I, they allege that PHP negligently denied Ms. Hall a liver transplant evaluation, either by "failing to follow its own policies and procedures that were not mandated by federal law" or "by having written or unwritten policies, procedures and practices to deny or hinder liver transplant evaluations and transplantation for persons 70 or older." *Id*. at ¶ 19. In Count II, they allege that PHP's denial of the request for a liver transplant evaluation was the product of "age discrimination" in violation of "its own non-discrimination policy." *Id*. at 5-6.[1] Plaintiffs maintain, both in their Complaint and in their

---

[1] In addition to these two claims asserted against PHP, Plaintiffs also assert claims against Presbyterian Healthcare Services for aiding and abetting PHP in its violation of its fiduciary duty (Count III) and for negligently failing to obtain a liver transplant evaluation (Count IV). *Doc. 37* at 6-8. As to Defendant Gregg Valenzuela, Plaintiffs allege that he negligently failed to obtain a liver transplant evaluation for Ms. Hall or, alternatively, that he negligently misrepresented that she would be unable to obtain an authorization for a liver transplantation from Defendant PHP (Count VI). *Id*. at 8-9.

briefing on PHP's Motion for Summary Judgment that these claims do not arise under the Medicare Act and do not seek Medicare benefits. *Id.* at ¶ 7; *Doc. 47*.

## II. FACTUAL BACKGROUND[2]

Decedent Ms. Hall purchased from PHP a Medicare Advantage plan – "Presbyterian Senior Plan 2 with Prescriptions (HMO)" – under 42 U.S.C. § § 1395-1395ggg Part C. Def.'s Mot. for Summ. J., *Doc. 40* ("Def.'s MSJ"), at Undisputed Fact ("UF") ¶ 1. A booklet issued in connection with the plan informed Ms. Hall that PHP was required "[to] cover all services covered by Original Medicare and [to] follow Original Medicare's coverage rules." *Id.* at UF ¶ 2. Under Ms. Hall's Medicare Advantage plan, PHP was required to cover services deemed to be "medically necessary,"[3] which the plan defined as "services . . . needed for the prevention, diagnosis, or treatment of [a] medical condition and [that] meet accepted standards of practice." *Id.* at UF ¶ 2; Pl.'s Resp. to Def.'s Mot. for Summ. J., *Doc. 47* ("Pl.'s Resp."), at UF ¶ 2.

Under some circumstances, liver transplants were covered by Ms. Hall's Medicare Advantage plan. Def.'s MSJ, at UF ¶ 3. For instance, liver transplants would be covered when there was advanced approval or "prior authorization." *Id.* The plan did

---

[2] In response to many of PHP's statements of undisputed facts, Plaintiffs offer what amounts to arguments about the legal significance of the facts rather than citations to materials in the record that dispute the asserted facts. *See* Fed. R. Civ. P. 56(c). While the Court has considered all the evidence in the light most favorable to Plaintiffs as the parties opposing the motion, for purposes of determining the undisputed facts, the Court has disregarded commentary by Plaintiffs that runs afoul of Federal Rule of Civil Procedure 56.

[3] Although Plaintiffs do not dispute that PHP was required to cover services that were deemed medically necessary, they maintain that a material issue of fact exists as to whether a liver transplant evaluation *was,* in fact, medically necessary. Pl.'s Resp. to Def.'s Mot. for Summ. J., *Doc. 47* ("Pl.'s Resp."), at Pl's Resp. to Def's UF ¶ 2. While the Court agrees that a dispute of fact exists as to the determination by PHP that a liver transplant evaluation was not medically necessary, it need not, indeed cannot, resolve these issues of fact in deciding the present motion.

not specify, however, that prior authorization by PHP was required for a liver transplant *evaluation* by a Medicare-approved transplant center. Pl.'s Resp. to Def's UF ¶ 3. Rather, the plan provided that if an enrollee "need[ed] a transplant, [PHP] would arrange to have [the] case reviewed by a Medicare-approved transplant center that [would] decide whether [the enrollee was] a candidate for a transplant." Def.'s MSJ, at UF ¶ 3.

On or about August 13, 2014, Gregg A. Valenzuela, M.D., a gastroenterologist working at the Presbyterian Healthcare Services GI Clinic, requested that PHP authorize[4] a liver transplant evaluation for Ms. Hall. Pl.'s Resp. to Def's UF ¶ 4; *Doc. 39*, Ex. B & C. Dr. Valenzuela's request was forwarded to Sandy Brown, R.N. ("Nurse Brown") of PHP on August 15, 2014. Def.'s MSJ, at UF ¶ 5. The forwarding e-mail indicated that Ms. Hall's model for end-stage liver disease ("MELD") score had been 13 as of July 10, 2014. Def.'s MSJ, at UF ¶ 5; *Doc. 39*, Ex. C, at 1. Nurse Brown reviewed Ms. Hall's case on August 18, 2014, and her note on that date stated in part:

> [Ms. Hall] is a 70 year old female with a history of [c]irrhosis[,] kidney disease[,] and high blood pressure. She also has a history of breast cancer and a density on chest x ray in the right lung. [C]all placed to [Dr. Valenzuela's office] to advise [that Ms. Hall] is over the age limit for transplant evaluation.

Def.'s MSJ, at UF ¶ 6; *Doc. 39*, Ex. C, at 1. The following morning, Nurse Brown wrote this update: "[Request] ha[s] been sent to [PHP's] medical director for liver transplant evaluation. Per [Presbyterian Health Plan medical policy (MPM 20.6)] member does not

---

[4] Plaintiffs take issue with Defendant PHP's assertion that Dr. Valenzuela "requested that PHP authorize a liver transplant evaluation," favoring, instead, an assertion that Dr. Valenzuela "referred" Ms. Hall for a liver transplant evaluation. Significantly, however, Defendant's language comports with the parties' Stipulated Facts (*Doc. 39* at ¶ 15), which were submitted to the Court on September 1, 2017. Plaintiffs have not, thus far, moved to withdraw any of those Stipulated Facts, and the Court will not disregard them on the basis of argument contained in Plaintiffs' response brief.

meet criteria for transplant eval. . . . [F]amily advised of possible denial related to age." Def.'s MSJ, at UF ¶ 7; *Doc. 39*, Ex. C, at 1.

PHP's medical director, Dr. Norman G. White, received an August 19, 2014 e-mail notifying him of Dr. Valenzuela's request that Ms. Hall receive a liver transplant evaluation. Def.'s MSJ, at UF ¶ 9; *Doc. 39*, Ex. D. The e-mail mentioned that Ms. Hall was 70 years old and that her diagnosis was non-alcoholic cirrhosis; it also summarized some of her past medical history, set forth her lab values from two weeks earlier, and indicated that her current MELD was 13. Def.'s MSJ, at UF ¶ 9; *Doc. 39*, Ex. D. Referring to PHP medical policy MPM 20.6, the e-mail suggested that Ms. Hall did "not meet criteria for liver transplant evaluation." Def.'s MSJ, at UF ¶ 9; *Doc. 39*, Ex. D. Dr. White wrote an e-mail that same day, indicating that "[b]ased on submitted documentation, [Ms. Hall] does not meet PHP MPM 20.6 criteria for consideration of liver transplant and evaluation for liver transplantation [, and] [b]ased on Presbyterian Health Plan criteria, the degree of liver disease is not severe enough to initiate liver transplant evaluation." Def.'s MSJ, at UF ¶ 10; *Doc. 39*, Ex. G.

At the time, PHP's MPM 20.6 provided that a PHP member could receive a liver transplant evaluation if she had "severe organ injury, dysfunction or symptomatic organ failure that [was] not amendable [sic] to other medical or surgical alternatives" and "[e]nd stage liver disease, as demonstrated by one of the following: [1] current or past history of acute/fulminant hepatic failure and/or variceal hemorrhage or [2] Platelets < 120,000, increased prothrombin time, decreased albumin, and increased bilirubin." Def.'s MSJ, at UF 11; *Doc. 39*, Ex. E. The parties disagree about whether Dr. Valenzuela's treatment notes demonstrate that Ms. Hall met these criteria. *Compare*

*Doc. 47* at 8-9, *with Doc. 49* at 6-7. Plaintiff maintains that Dr. White's stated reasons for the denial were pretextual, and that Ms. Hall's age was the "real reason" for the denial of the liver transplant evaluation. *Doc. 47* at 9.

On or about August 26, 2014, a PHP employee informed a member of the Presbyterian Healthcare Services GI clinic staff that Dr. Valenzuela's request for a liver transplant evaluation had been denied because Ms. Hall "d[id] not meet criteria for transplant evaluation." Def.'s MSJ, at UF ¶ 12; *Doc. 39*, Ex. C. Thereafter, Ms. Hall received from PHP a "Notice of Denial of Medical Coverage" for the request for a liver transplant evaluation. *Doc. 39*, at ¶ 19 & Ex. H. The notice, dated September 24, 2014, stated: "Based on the information we received, you do not meet the Presbyterian Health Plan medical policy (MPM 20.6) criteria for the requested liver transplant evaluation. Based on the Presbyterian Health Plan medical policy, the degree of your liver disease is not severe enough to initiate a liver transplant evaluation." Def.'s MSJ, at UF ¶ 13; *Doc. 39*, Ex. H.

The Notice of Denial of Medical Coverage also informed Ms. Hall that she had the right "to ask [PHP] to review [its] decision by asking for an appeal . . . within 60 days of the date of [the] notice" or later if she had "a good reason for missing the deadline." Def.'s MSJ at UF ¶ 14; *Doc. 39*, Ex. H, at 1. The notice assured Ms. Hall that a decision would be made within 30 days for a "Standard Appeal" or within 72 hours for a "Fast Appeal." Def.'s MSJ, at UF ¶ 14; *Doc. 39*, Ex. H, at 2. Moreover, it provided instructions for pursuing an appeal and advised that if PHP continued to deny her request following her appeal, it would "send [her] a written decision and automatically send [her] case to an independent reviewer." Def.'s MSJ, at UF ¶ 14; *Doc. 39*, Ex. H, at 2-3. The notice did

not explain, however, that any rights to sue would be lost if Ms. Hall did not appeal. Pl.'s Resp. to Def.'s UF ¶ 14; *see also Doc. 39* at ¶ 19 & Ex. H.

Ms. Hall's plan booklet also provided information about her appeal rights. Def.'s MSJ at UF ¶ 15; *Doc. 39*, Ex. A, at 21-22, 171-82. More particularly, it advised that even if an independent reviewer turned down her appeal, Ms. Hall could appeal further – to an administrative law judge, an appeals council, and, finally, to a federal district court. Def.'s MSJ at UF ¶ 15; *Doc. 39*, Ex. A, at 211-13.

Ms. Hall did not appeal PHP's decision to deny the request for a liver transplant evaluation. *Doc. 39*, at ¶ 20. Her husband and daughter would testify that "they heard Dr. Valenzuela tell [Ms. Hall] that she would not be able to get a transplant approved by PHP even if she appealed the denial, and that she could instead go overseas to China and pay for a liver transplant herself."[5] *Id.*

On December 27, 2014, Ms. Hall died of end-stage liver disease. Def.'s MSJ at UF ¶ 17; *Doc. 39*, at ¶¶ 22-23.

## III. LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "genuine" dispute exists where the evidence is such that a reasonable jury could resolve the issue either way. *See Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A mere scintilla of evidence in the non-movant's favor is not

---

[5] Although PHP argues in its reply brief that this statement of fact constitutes hearsay, it has not moved to withdraw the statement from the Stipulated Facts submitted to the Court. Absent such a withdrawal, the Court treats the hearsay objection as waived for purposes of PHP's Motion for Summary Judgment.

sufficient. *Anderson*, 477 U.S. at 252. However, the court must consider all the evidence in the light most favorable to the party opposing summary judgment. *See Trask v. Franco*, 446 F.3d 1036, 1043 (10th Cir. 2006).

Both the movant and the party opposing summary judgment are obligated to "cit[e] to particular parts of materials in the record" to support their factual positions. Fed. R. Civ. P. 56(c)(1)(A). Alternatively, they may "show[] that materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B); *see also Medlock v. United Parcel Serv., Inc.*, 608 F.3d 1185, 1189 (10th Cir. 2010) ("[I]f the matter in issue concerns an essential element of the nonmovant's claim, the moving party may satisfy the summary judgment standard 'by identifying a lack of evidence for the nonmovant on [that] element.'" (internal quotation and citation omitted) (alteration in original)). Materials cited to establish the presence or absence of a genuine dispute must be capable of being in a form that would be admissible in evidence. Fed. R. Civ. P. 56(c)(2).

## IV. ANALYSIS

PHP makes three arguments in support of its motion for summary judgment: 1) that Plaintiffs' claims against it are preempted by the Medicare Act's broad preemption provision; 2) that Plaintiffs failed to exhaust their administrative remedies; and 3) that it is entitled to absolute immunity. *See Doc. 40.* Because the Court resolves the first two arguments, which are analytically related,[6] in favor of PHP, it need not reach the third.

---

[6] Courts have not always neatly separated the issues of preemption and exhaustion in the evaluating their subject matter jurisdiction over claims against Medicare Advantage organizations. Indeed, at times they have merged the analyses, employing the same standard – whether the claims "arise under" the Medicare Act – to determine both the issues of preemption

Before delving into the viability of PHP's asserted federal defenses, the Court finds it worthwhile to give a brief overview of Medicare and Ms. Hall's health insurance coverage with PHP. "Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395 *et seq.* (2006), establishes the federally-funded health insurance program for the aged and disabled, commonly known as Medicare. The Centers for Medicare and Medicaid Services ("CMS") administers the Medicare program on behalf of the Secretary." *Via Christi Reg'l Med. Ctr., Inc. v. Leavitt*, 509 F.3d 1259, 1261 (10th Cir. 2007). The Medicare program is currently divided into four parts, referred to as Parts A, B, C, and D. At issue here is Part C, which "allows eligible participants to opt out of traditional Medicare[7] and instead obtain various benefits through [private insurers called Medicare Advantage organizations], which receive a fixed payment from the United States for each enrollee." *Sunshine Haven Nursing Operations, LLC v. U.S. Dep't of Health & Human Servs., Ctrs. for Medicare & Medicaid Servs.*, 742 F.3d 1239, 1244 n.2 (10th Cir. 2014).

Ms. Hall enrolled in a Medicare Part C, Medicare Advantage plan through PHP. *Doc. 40* at 6; *Doc. 47* at 1. PHP, a Medicare Advantage organization, received a

and exhaustion. *See, e.g., Ardary v. Aetna Health Plans of Cal., Inc.*, 98 F.3d 496 (9th 1996); *Kovach v. Coventry Health Care, Inc.*, No. 10cv0536, 2011 WL 284174 (W.D. Penn. Jan. 25, 2011). In these cases, it appears that courts decided whether there was "preemption" under 42 U.S. § 405(g) and (h), the statutory provisions outlining the mandatory administrative process for claims "arising under" the Medicare Act. Here, the Court attempts to separate the issues of preemption under the Medicare Act's preemption provision, § 1395w-26(b)(3), from exhaustion pursuant to 42 U.S.C. § 405(g) and (h). Notably, claims may be preempted under § 1395w-26(b)(3) even if they are not subject to the Medicare Act's exhaustion provisions. *See Uhm v. Humana, Inc.*, 620F.3d 1134, 1138 (9th Cir. 2010).

[7] Parts A and B comprise the more "traditional" fee-for-service Medicare services and are managed not by private insurers, but by the federal government. *See, e.g., Sunshine Haven Nursing Operations, LLC*, 742 F.3d at 1243–44 & 1244 n.2. Part D is the most recent addition to the program and includes the Medicare Prescription Drug Benefit program. *Id.* at 1244 n.2.

payment each month that was not dependent on the services actually provided for Medicare Advantage enrollees like Ms. Hall. S*ee Sunshine Haven Nursing Operations, LLC*, 742 F.3d at 1244 n.2.

### A. Preemption

PHP contends that the Medicare Act's broad preemption provision for Medicare Advantage organizations, 42 U.S.C. § 1395w-26(b)(3), preempts the claims against it here. Plaintiffs maintain otherwise. Both parties begin with the language of the preemption provision and its legislative history. The Court follows suit.

The preemption section provides that standards established through CMS's Medicare Advantage regulations "supersede any State law or regulation (other than State licensing laws or State laws relating to plan solvency) with respect to [Medicare Advantage] organizations." 42 U.S.C. § 1395w-26(b)(3). PHP insists that pertinent legislative history confirms Congress' sweeping preemptive intent. For instance, it notes that the congressional conference report observed that the provision, which was part of the 2003 Medicare Act amendments, "clarif[ies] that the [Medicare Advantage] program is a federal program operated under Federal rules. State laws[] do not, and should not apply, with the exception of state licensing laws or state laws related to plan solvency." *Doc. 40* at 8 (quoting H.R. Rep. No. 108-391, at 557 (2003) (Conf. Rep.) *as reprinted in* 2003 U.S.C.C.A.N. 1808, 1926). Read most broadly, this begs the question whether Congress intended to preempt *all* state law claims against Medicare Advantage organizations so long as they do not involve solvency or licensing.

Plaintiffs insist that Congress did not so intend. They have framed their claims against Defendant PHP to allege that it negligently denied Ms. Hall a liver transplant

evaluation – either by failing to follow its own policies and procedures or by having certain written or unwritten policies, procedures, and practices – and that this denial was the product of "age discrimination" in violation of "its own non-discrimination policy." *Id.* at 5-6. They rely upon a different piece of legislative history in support of their position that their claims are *not* preempted, quoting the following explanation given by CMS when finalizing regulations concerning the Medicare Part D drug benefit, which is subject to the same preemption clause:

> [W]e did not believe we would have the authority under Part D to set specific tort remedies or to govern resolution of private contracting disputes between plans and their subcontractors. We believed that the Congress did not intend for our regulations to supersede each and every State requirement applying to plans—particularly those for which the Secretary lacks expertise and authority to regulate. Thus, we did not believe, for example, that wrongful death or similar lawsuits based upon tort law would be superseded by the appeals process established in these regulations.

*Doc. 47* at 12-13 (quoting Medicare Prescription Drug Benefit, 70 Fed. Reg. 4194, at 4362 (Jan. 28, 2005)). Given this explanation, Plaintiffs maintain that "Congress left open a wide field for the operation of state law pertaining to standards for the practice of medicine and the manner in which medical services are delivered." *Id.* at 13 (citing *McCall v. Pacificare of Cal.*, 21 P.3d 1189 (Cal. 2001)).

In the Court's view, it is of little consequence whether CMS "believe[s]" that wrongful death suits are superseded by the Medicare appeals process. Furthermore, in the same explanation that it offered in 2005, CMS also indicated that it "believe[s] that an enrollee will still have State remedies available in cases *in which the legal issue before the court is independent of an issue related to the organization's status as a [Medicare Advantage] plan*." 70 Fed. Reg. 4193, at 4362 (Jan. 28, 2005) (emphasis

added). Yet, it is not immediately clear to the Court that the legal issues before it are in fact independent of PHP's status as a Medicare Advantage organization. After all, Plaintiffs' claims center around the denial of a Medicare benefit. Finally, while it may be true that Congress has left room for state law claims based on standards for the practice of medicine and the manner in which medical services are delivered, this says nothing of state law claims based upon a Medicare Advantage organization's denial of a benefits as medically unnecessary. In the end, the referenced legislative history does not resolve the preemption issue.

The parties also refer the Court to case law from a number of federal district courts. PHP relies principally on *Rudek v. Presence Our Lady of the Resurrection Medical Center*, No. 13 C 06022, 2014 WL 5441845 (N.D. Ill. Oct. 27, 2014), while Plaintiffs refer to a trio of cases: *Kaohi v. Kaiser Foundation Health Plan*, No. 15cv0266 SOM/RLP, 2015 WL 6472231 (D. Ha. Oct. 27, 2015), *Kovach v. Coventry Health Care*, No. 10cv0536, 2011 WL 284174 (W.D. Pa. Jan. 25, 2011), and *Zanecki v. Health Alliance Plan*, No. 12-13234, 2013 WL 2626717 (E.D. Mich. June 11, 2013).

In *Rudek*, the daughter of a Medicare Advantage beneficiary sued a Medicare Advantage organization for injuries sustained by her beneficiary-father, allegedly resulting from an interruption in his Medicare coverage. *Rudek*, 2014 WL 5441845 at *1. The court considered whether the plaintiff's state law consumer protection claims, which arose from the delivery of a notice of termination to her father, were preempted by the Medicare Act. *Id.* at *9-18. The court held that the plaintiff's claims *were* preempted, because detailed federal regulations regarding notices of termination of benefits left no room for the operation of state law. *Id.* at *13-16. PHP argues that, like the delivery of

the notices in *Rudek*, liver transplant policies are also creatures of federal law and regulation. While there can be no question that federal regulations factored into PHP's decision to deny the request for a liver transplant evaluation for Ms. Hall, these regulations arguably left more discretion to PHP than the regulations at issue in *Rudek*.

Labeling *Rudek* an "analytical outlier," Plaintiffs contend that the "more numerous and better reasoned cases" support their position: that there is no preemption of their claims. However, the courts' analyses in *Kaohi*, *Kovach*, and *Zanecki* were primarily devoted to the issue of exhaustion of administrative remedies, which the Court takes up below, and these cases contribute little to the question of preemption under 42 U.S.C. § 1395w-26(b)(3). In *Kaohi*, for example, the court merely indicated that it was "unpersuaded" by the defendant's "reference to 'Congress' strengthening of Medicare's broad preemptive scope," and explained that a broader preemptive scope did not somehow transform a medical malpractice claim into one for benefits under the Medicare Act. *Kaohi*, 2015 WL 6472231, at *5. In *Kovach*, the court seemed to conflate the issue of preemption with the issue of exhaustion when it concluded that "even if § 405(h)[, the statute proscribing the administrative process,] were to completely preempt claims under state law, Plaintiff's claims are not completely preempted because they do not arise under the Medicare Act." *Kovach*, 2011 WL 284174, at *5.

Plaintiffs do cite one case that refers directly to the Act's preemption provision, §1395w-25: *Olsen v. Quality Continuum Hospice, Inc.*, 380 F. Supp. 2d 1225 (D.N.M. Feb. 25, 2004). *See Doc. 47* at 14. In *Olsen*, the Honorable James O. Browning of this district concluded that "the preemption standards of § 1395w-26 . . . only apply to override contrary state law standards regarding the solvency of certain provider-

sponsored organizations." *Id.* at 1232-33. But the undersigned reads Section 1395w-26 differently. That is, when the statute provides that Medicare regulations supersede state laws and regulations, except for those involving licensing or plan solvency, it means that licensing and solvency laws are *saved* from preemption, *not* that they are the only categories of laws preempted.[8]

Still, the Court is not willing to say at this juncture that *all* state law claims against a Medicare Advantage organization, other than those involving licensing and plan solvency, are necessarily preempted. Instead, it follows the court's lead in *Rudek* and adopts a framework to consider whether Plaintiffs' claims are governed by federal Medicare standards and regulations. Notably, the courts employ a similar framework in *Morrison v. Health Plan of Nevada*, 328 P.3d 1165, 1167, 1169-70 (Nev. 2014) and *Uhm,* 620 F.3d at 1140.

In *Morrison*, a Medicare insured brought a common law negligence claim against a Medicare Advantage organization, alleging that it failed to properly investigate and monitor a contracted medical provider. *Morrison*, 328 P.3d at 1167. The Nevada Supreme Court determined that federal law preempted the plaintiff's negligence claim

---

[8]     Prior to 2003, the Medicare preemption provision stated that federal standards would supersede state law and regulations with respect to MA plans to the extent that such law or regulation was "inconsistent" with such standards, and it identified certain standards that were specifically superseded. The legislative history clarifies that the 2003 amendment was intended to increase the scope of preemption, noting that, "the [Medicare Advantage Program] is a federal program operated under Federal rules and that State laws, do not, and should not apply, with the exception of state licensing laws or state laws related to plan solvency."

*New York City Health & Hosps. Corp. v. WellCare of New York, Inc.*, 801 F. Supp. 2d 126, 135-36 (S.D.N.Y. 2011).

pursuant to Section 1395w-26(b)(3). *Id.* at 1170. The court reasoned that "as long as a federal standard exists regarding the conduct at issue[,] all [s]tate standards, including those established through case law, are preempted to the extent they specifically would regulate [Medicare Advantage] plans." *Id.* at 1169 (internal quotations omitted). The court explained that although CMS did not select the providers with which the Medicare Advantage organization could contract, federal regulations *did* require the organization to select and retain providers that met the qualifications of the Medicare Act. *Id.* at 1174. As such, allowing the state negligence claim to proceed "could result in the imposition of additional state law requirements on the quality assurance regime regulated by CMS." *Id.* at 1169-70.

Likewise, in *Uhm*, the Ninth Circuit determined that the Medicare beneficiaries' consumer protection and fraud claims, which were based on representations by the defendant that Medicare prescription drug coverage would begin on a certain date, were preempted by extensive CMS regulations governing prescription drug plan marketing materials. *Uhm*, 620 F.3d at 1150. The court reasoned that because "the conduct underlying [the plaintiffs'] allegations [was] directly governed by federal standards," the claims were preempted pursuant to Section 1395w-26(b)(3). *Id.* at 1158.

Significantly, here, the Medicare Act required PHP to determine whether a liver transplant was "medically necessary" on a case-by-case basis. *See* 42 U.S.C. § 1395f(a)(3)(6); § 1395w-22(d)(1)(C)(i), D. PHP's issuance of the Notice of Denial of Medical Coverage, which asserted that the degree of Ms. Hall's liver disease was not severe enough to initiate a liver transplant evaluation, shows that it made that determination. Additionally, a CMS regulation explicitly required Medicare Advantage

organizations, like PHP, to "[e]stablish written . . . [p]olicies and procedures (coverage

rules, practice guidelines, payment policies and utilization management) that allow for

individual medical necessity determinations." 42 C.F.R. § 422.112(a)(6)(ii). By

promulgating and applying its liver transplant policy, MPM 20.6, one could say that PHP

was fulfilling a basic government task related to Medicare benefits.

Moreover, PHP explains that it based its liver transplant policy on Medicare

coverage rules. *Doc. 40* at 10. For instance, the criteria of "end-stage liver disease"

found in MPM 20.6 was derived in part from Medicare's national coverage

determination, which indicated that liver transplants "may be an accepted treatment for

patients with end-stage liver disease." *Compare Doc. 39*, Ex. E, *with* Medicare National

Coverage Determinations Manual § 260.1(A) (2012), https://www.cms.gov/Regulations-

and-Guidance/Guidance/ Manuals/Internet-Only-Manuals-IOMs-Items/

CMS014961.html?DLPage=1&DL Entries=10&DLSort=0&DLSortDir=ascending.

Ultimately, the Court is satisfied that Plaintiffs' state law claims are preempted by

federal regulations that required PHP to make coverage determinations through

application of the medical necessity standard. As to Plaintiffs' position that PHP denied

Ms. Hall a liver transplant evaluation because of her age, rather than under the medical

necessity standard, the Court concludes that this disputed issue of fact is not material to

the preemption analysis. Even a claim that a Medicare Advantage organization

wrongfully applied or wholly disregarded the medical necessity standard is still a claim

alleging conduct that was governed by federal Medicare standards. Put another way,

Plaintiffs' claims against PHP depend upon a showing that PHP violated standards,

perhaps of its own making, which federal Medicare regulations required it to promulgate

and apply in determining medical necessity. The Act's preemption provision is broad enough to cover such claims.

### B. Exhaustion

Any action that seeks to recover on a claim "arising under" the Medicare Act must first be brought through the administrative appeal process. *See Uhm*, 620 F.3d at 1140; 42 U.S.C. § 405(g)-(h); 42 C.F.R. § 422.576. This administrative channeling requirement serves important governmental interests in administrative efficiency and judicial economy, and it protects administrative agency authority, giving agencies an opportunity to correct their own mistakes before being subject to a federal lawsuit. *Woodford v. Ngo*, 548 U.S. 81, 89 (2006). State law claims may be construed as "arising under" the Medicare Act if: (1) the standing and substantive basis for presentation of the claim is the Medicare Act, or (2) the claim is "inextricably intertwined" with a claim for reimbursement of Medicare benefits. *Heckler v. Ringer*, 466 U.S. 602, 606 (1984).

Here, Plaintiffs deny that their claims against PHP "arise under" the Medicare Act. They maintain that rather than seeking reimbursement of benefits under Medicare, they seek damages for PHP's medical negligence. Their position mimics that of the plaintiffs in *Ardary v. Aetna Health Plans*, 98 F.3d 496 (9th Cir. 1996).

In *Ardary*, the surviving husband and children of Cynthia Ardary, a Medicare beneficiary, brought state law claims against Aetna Health Plans of California. *Ardary*, 98 F.3d at 497. Ms. Ardary's heirs alleged that she had enrolled in Aetna's health maintenance organization plan based in part upon representations by an Aetna representative that Aetna would authorize a transfer to a larger hospital in the event of a

medical emergency. *Id.* at 497. When Ms. Ardary suffered a heart attack and her physician allegedly made "repeated requests" that she be transferred to a larger facility, the plan's administrators denied the transfer. *Id.* at 497-98. Attributing Ms. Ardary's death to Aetna's denial of the transfer, her heirs filed a wrongful death action and sought compensatory and punitive damages under state law. *Id.* The Ninth Circuit determined that the state law wrongful death claims against the private Medicare provider did not "arise under" the Medicare Act. *Id.* at 501. Under the first prong of the *Heckler* analysis, the court determined that the standing and substantive basis for the presentation of the plaintiffs' claims was state common law, not the Medicare Act. *Id.* at 499. Under the second prong, it concluded that the plaintiffs' state law claims were not "inextricably intertwined with the denial of benefits," because they were "at bottom not seeking to recover benefits." *Id.* at 500. In reaching this conclusion, the court emphasized that the decedent's death could not "be remedied by the retroactive authorization or payment of the airlift transfer." *Id.*

It is equally true that Ms. Hall's death cannot be remedied through the retroactive authorization of a liver transplant evaluation. Even so, the Court is not satisfied that it necessary follows that Plaintiffs' claims are therefore not "inextricably intertwined" with the denial of benefits. Under the court's rationale in *Ardary*, the remedy sought (i.e. whether compensatory damages or strictly reimbursement payments available under Medicare) was dispositive of the "arising under" analysis. While this straightforward rule has some initial appeal, the Court ultimately finds it too simplistic. Moreover, such a rule risks eviscerating the Medicare administrative process devised by Congress, with savvy plaintiffs crafting claims that convert grievances regarding denied benefits into medical

negligence claims in order to circumvent the administrative process. The Court therefore feels compelled to apply a more nuanced approach to determining whether claims are "inextricably intertwined" with the denial of Medicare benefits.

In rejecting the remedy-focused rationale in *Ardary*, the undersigned may be departing from the rationale of the only other judge in this district to have passed on the issue. In *Olsen*, Judge Browning relied upon *Ardary* to conclude that a plaintiff's claims did not "arise under" the Medicare Act, because he was not seeking to recover Medicare benefits but, instead, damages under state law. *Olsen*, 380 F. Supp. 2d at 1231. There, the plaintiff's complaint "set forth numerous common law and statutory causes of action premised on [the defendant's] alleged failure to provide him with certain medical treatment." *Id.* at 1227. In short, he alleged that the defendant provider violated its contractual obligations to provide Medicare benefits when it refused to provide a treatment prescribed for him. *Id.* While Judge Browning followed the rationale in *Ardary*, focusing on the remedy sought by the plaintiff to determine that the claim did not "arise under" the Medicare Act, he did not directly address the exhaustion issue. *See id.* Moreover, at the time he decided *Olsen*, Judge Browning did not have the benefit of the courts' analyses in the later decisions of *Kaohi*, *Uhm*, or *Associates Rehabilitation Recovery, Inc. v. Humana Medical Plan, Inc.*, 76 F. Supp. 3d 1388 (S.D. Fla. 2014), each of which the undersigned finds helpful and persuasive.

In *Kaohi*, the court analyzed different varieties of claims made by Medicare beneficiaries or their heirs, looking beyond the particular remedies sought. *Kaohi*, 2015 WL 6472231. The court explained that the plaintiff's claims there were premised upon Kaiser Foundation Health Plan's alleged failure to properly diagnose and treat the

plaintiff and upon its failure to ensure that laboratory findings were properly communicated to her and to her doctors. *Id.* at *4. It determined that these claims stood in contrast to those in *Uhm*, where the plaintiffs asserted claims for breach of contract and unjust enrichment for the failure to provide prescription drug benefits. *Id.* Although the claims in *Uhm* were grounded in state law and sought compensatory damages like those in *Kaohi*, the Ninth Circuit found them to be "at bottom, merely creatively disguised claims for benefits." *Uhm*, 620 F.3d at 1143.

In this Court's view, the *Kaohi* court seized upon a critical distinction: the Medicare provider in *Kaohi* could not demonstrate "how the administrative process could affect any of the claims through a decision about a Medicare benefit." *Kaohi,* 2015 WL 6472231, at *4. In *Uhm*, on the other hand, the court found that the plaintiffs' claims for Medicare benefits "*could* have been remedied through the [Medicare] Act's administrative review process." *Uhm,* 620 F.3d at 1144 (emphasis added). Implicit in the *Kaohi* court's rationale is the acknowledgment that the administrative process is designed to address coverage decisions, not medical negligence claims involving the quality of medical treatment received by the beneficiary.

A close reading of the Ninth Circuit's decision in *Uhm* reveals that, although the court purported to rely in part on its earlier decision in *Ardary*, it followed a different analytical approach and reached a different conclusion. In *Uhm*, the court explicitly rejected the plaintiffs' argument that their claims did not "arise under" the Medicare Act because they were "seeking damages beyond the reimbursement of benefits." *Uhm,* 620 F.3d at 1142. Moreover, it explained that the "Supreme Court ha[s] refused to treat the remedy sought as dispositive of the 'arising under' question." *Id.* (citing *Shalala v. Ill.*

*Council on Long Term Care, Inc.*, 529 U.S. 1 (2000)). Noting, as it had in *Ardary*, that the court must consider whether the claim is "at bottom . . . complaining about the denial of Medicare benefits," the court reasoned that the plaintiffs' claims for breach of contract and unjust enrichment for the failure to provide prescription drug benefits were "at bottom, merely creatively disguised claims for benefits." *Id*. at 1143. Consequently, it dismissed these unexhausted claims for lack of subject matter jurisdiction. *Id*.

The court also grappled with the "arising under" question in *Associates Rehabilitation Recovery, Inc.*, 76 F. Supp. 3d 1388 (S.D. Fla. Dec. 10, 2014), but in the context of claims asserted by a medical services provider against a Medicare Advantage organization for the failure to provide reimbursement for medical treatment provided to Medicare enrollees. *Id*. at 1392. At the center of the dispute in *Associates* were the providers' allegations that the Medicare Advantage organization had denied therapy rehabilitation services "as not medically necessary, determining that particular services were not covered under the Medicare Act or the enrollee's Medicare Advantage plan." *Id*. at 1390. The court concluded, first, that the separate agreement between the provider and Medicare Advantage organization did not excuse the provider from exhaustion of the Medicare appeals process. *Id*. at 1392-93. More significantly, however, it held that a determination of whether services are considered medically necessary must be reviewed through the Medicare appeals process, reasoning as follows:

> While Plaintiff frames its Complaint as seeking a declaratory judgment that Defendant is not entitled to utilize certain payment reductions, this does not change the character of the Complaint. Defendant's decisions to deny claims were dependent on compliance with the Medicare Act. Therefore, Plaintiff's claims arise under the Medicare Act. Accordingly,

only after Plaintiff has exhausted the administrative process may Plaintiff file a civil action in a federal district court.

*Id.* at 1393 (citing 42 C.F.R. § 422.612(a) (2014)).

Here, Plaintiffs insist that they are not complaining about the denial of Medicare benefits but are, rather, seeking damages "due to PHP's medical negligence and profit-motivated denial of benefits that led to [Ms. Hall's] wrongful death." *Doc. 47* at 19. Notably, however, the medical negligence of which they complain is PHP's denial of a liver transplant evaluation. In their Complaint, Plaintiffs describe the manner of negligence as the failure to follow policies or the adoption of certain written or unwritten policies, procedures, and practices. *Doc. 37* at ¶ 21. In their response brief, they suggest that the manner of negligence may have been "a wrongful decision that a transplant evaluation was not 'medically necessary.'" *Doc. 47* at 7. But, in the Court's view, these are creatively-styled claims seeking redress for PHP's denial of a Medicare benefit, in other words, claims that are "inextricably intertwined" with the denial of Medicare benefits and which "arise under" the Medicare Act. *See Uhm*, 620 F.3d 1134; *Assocs. Rehab. Recovery, Inc.*, 76 F. Supp. 3d at 1393; *accord Green v. Humana Ins. Co.*, No. 13cv0344 LG/JMR, 2013 WL 6046051 (S.D. Miss. Nov. 14, 2013) (holding that the plaintiff's claims, which were premised upon a Medicare Advantage organization's denial of coverage for a generic medication, were "inextricably intertwined with her claim for Medicare benefits").

While it is true that Ms. Hall's death cannot now be remedied through her heirs' resort to the administrative process, her failure, in the first instance, to administratively appeal PHP's denial of the liver transplant evaluation nevertheless forecloses the present action. *See* 42 C.F.R. § 422.576 (a Medicare Advantage organization's

coverage determination is "binding on all parties" unless successfully appealed). Under the Medicare Act and the regulations promulgated thereunder, Ms. Hall had the opportunity to request an immediate appeal of the denial of a liver transplant evaluation. Indeed, she could have requested a "Fast Appeal," under which PHP would have had 72 hours to issue a decision. If that appeal was denied, an independent organization would have automatically reviewed the decision. Following this process could have possibly led to a decision in Ms. Hall's favor; to be sure, it would have given PHP and the government an opportunity to correct PHP's mistakes or to revise its policies.

Because Plaintiffs concede that Ms. Hall did not appeal the denial of a liver transplant evaluation, and because this Court concludes that Plaintiffs' claims against PHP "arise under" the Medicare Act, these claims must be dismissed for lack of subject matter jurisdiction.

## V. CONCLUSION

For the reasons discussed above, the Court concludes that Plaintiffs' claims against PHP are preempted by the Medicare Act. It further finds that because there has been no exhaustion of the administrative remedies, the Court must dismiss those claims with prejudice.

Previously, at an April 4, 2017 hearing on Plaintiffs' Motion to Remand, Plaintiffs conceded that removal was appropriate pursuant to the federal officer removal statute, 28 U.S.C. § 1442(a)(1). *See Doc. 24*. Having now determined that Plaintiffs' claims against PHP are preempted, unexhausted, and subject to dismissal, the Court will remand Plaintiffs' remaining state law claims against Defendant Presbyterian Healthcare Services and Gregg Valenzuela. See 28 U.S.C. § 1367(c) (providing that

district courts may decline to exercise supplemental jurisdiction over a claim if "the district court has dismissed all claims over which it has original jurisdiction").

Wherefore,

**IT IS HEREBY ORDERED** that Defendant Presbyterian Health Plan, Inc.'s Motion for Summary Judgment on Federal Defenses (*Doc. 40*) is hereby granted and Plaintiffs' claims against Defendant PHP are hereby dismissed with prejudice.

**IT IS FURTHER ORDERED** that Plaintiff's remaining claims are hereby remanded to the Second Judicial District Court, Bernalillo County, New Mexico.

_____
UNITED STATES MAGISTRATE JUDGE
Presiding by Consent